UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEFINA S., DEAJA D., CYNTHIA Q.,
SHANTELL S., and BIANCA M. on behalf of
themselves and all others
similarly situated,

Plaintiffs,

- against -

THE CITY OF NEW YORK,

Defendant.

---

Index No.17-7661

**COMPLAINT**

## PRELIMINARY STATEMENT

1.      Five named Plaintiffs bring this lawsuit on behalf of a class of all parents with actual or perceived intellectual disabilities ("Plaintiffs") who have been or will be investigated for child abuse or neglect by Defendant New York City's Administration for Children's Services ("ACS").  Plaintiffs seek both declaratory and injunctive relief against the City for violating their rights under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

2.      ACS investigates allegations of abuse and neglect in New York City.  In the course of such investigations, ACS consistently discriminates against Plaintiffs, both directly and indirectly, by failing to provide services, programs, and activities tailored to their needs and by assuming that parents with intellectual disabilities are unable to parent safely.

3.      As a result of ACS's discriminatory practices against Plaintiffs, and as a result of ACS's failure to provide these parents with appropriate services tailored to their special needs, parents with actual or perceived intellectual disabilities are

disadvantaged at every stage of a child welfare case in that ACS consistently and unnecessarily: a) finds indications of neglect or abuse; b) seeks court intervention instead of offering preventive services at the inception of an investigation; c) more readily removes or seeks removal of children from these parents; d) delays the reunification of children with their parents who have intellectual disabilities; and e) fails to refer the parents to appropriately tailored services, or to provide the opportunity for parents to complete services that will address ACS's concerns about the risks of harm.  ACS also consistently fails to offer parents with actual or perceived intellectual disabilities administrative dismissal of abuse and neglect petitions, and instead is more likely to seek a finding of abuse or neglect, and to initiate termination of parental rights proceedings.

4.      Plaintiffs seek a ruling that the actions of the ACS described in this complaint violate the statutory rights of all parents with actual or perceived intellectual disabilities who are subject to investigation by ACS, and injunctive relief remedying these violations.

**<u>PARTIES</u>**

5.      Plaintiff Josefina S. is a parent with an intellectual disability who is being investigated by ACS.  She resides in Bronx, N.Y.

6.      Plaintiff Shantell S. is a parent with an intellectual disability who is being investigated by ACS.  She resides in Brooklyn, N.Y.

7.      Plaintiff Bianca M. is a parent with an intellectual disability who is being investigated by ACS.  She resides in Manhattan, N.Y.

8.      Plaintiff Deaja D. is a parent with an intellectual disability who is being investigated by ACS.  She resides in Manhattan, N.Y.

2

9.    Plaintiff Cynthia Q. is a parent with an intellectual disability who is being investigated by ACS.  She resides in Bronx, N.Y.

10.    Defendant the City of New York ("City") is a municipal entity created and authorized under the laws of the State of New York.

11.    Defendant City is charged with certain duties and responsibilities under the Social Services Law and the Family Court Act, which include, but are not limited to, the care and protection of New York City children.  Defendant City carries out these responsibilities by and through ACS.

12.    Defendant City is authorized by law to maintain and be responsible for ACS.  As the acts or omissions complained of in this complaint are those of ACS, references herein to the Defendant shall refer specifically to the acts or omissions of ACS.

## JURISDICTION AND VENUE

13.    This action arises under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794.  This Court thus has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

14.    This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, its inherent equitable powers, and Rule 57 of the Federal Rules of Civil Procedure.

15.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b), as a substantial part of the acts and omissions complained of occurred in this district.  Additionally, ACS's headquarters are located in the Southern District of New York.

## STATUTORY SCHEME

**The Rehabilitation Act of 1973**

16.     Section 504 of the Rehabilitation Act ("Section 504"), provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

17.     The Rehabilitation Act defines an "individual with a disability" as any person who:

(a)     [has] a physical or mental impairment that substantially limits one or more major life activities of such individual;

(b)     [has] a record of such an impairment; or

(c)     [is] regarded as having such an impairment . . .

29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1).

18.     Defendant receives federal financial assistance administered by the Federal Department of Health and Human Services through the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 *et seq*.  As a result, it is subject to the requirements of Section 504.

**The Americans with Disabilities Act**

19.     Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

20.    The ADA defines a "public entity" as "any department, agency . . . or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1)(B).

21.    The ADA, like the Rehabilitation Act, defines "disability" as:

(a)    a physical or mental impairment that substantially limits one or more major life activities of such individual;

(b)    a record of such an impairment; or

(c)    being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).

22.    An intellectual disability is a disability for the purposes of the ADA.

23.    ADA Title II regulations require that all public entities "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(a).

24.    The regulations also provide that public entities, either directly or through contractual licensing or other arrangements, may not:

(i)    Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii)    Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii)     Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

. . .

(iv)     Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1).

**ACS Is Subject to the ADA and the Rehabilitation Act of 1973**

25.     ACS is a public entity required by law to make reasonable efforts to prevent the need for removing a child from the child's home; and when removed, to make it possible for a child to safely return home as soon as possible.  *See* 42 U.S.C. § 671(a)(15).

26.     As a public entity, it is subject to the requirements of the ADA.

27.     Title II of the ADA and Section 504 of the Rehabilitation Act regulate ACS's treatment of parents, and specifically, the "services, programs, and activities" provided by ACS to parents throughout abuse and neglect investigations and proceedings.

28.     The ADA and the Rehabilitation Act require that parents with disabilities receive services and be allowed to participate in programs and activities offered by the City and the State free from discrimination.  ACS is bound by these laws in the provision of services to families.

**ACS Is Legally Obligated to Provide Appropriate Services to Parents**

29.     ACS, along with its agents, including but not limited to all caseworkers, family service unit case planners, and preventive services providers and foster care workers, are governed by the New York Social Services Law and the Codes, Rules, and Regulations of the State of New York.  Under those rules and regulations, ACS must "coordinate, provide or arrange for and monitor . . . rehabilitative services for children and their families" throughout the various stages of an ACS investigation.  N.Y. Soc. Serv. Law § 424 (13).

30.     To ensure the provision of appropriate services, ACS is charged with making assessments and creating a family service plan to identify the appropriate services necessary for the child and members of the child's family.  N.Y. Soc. Serv. Law § 409-e; *see also* N.Y. Comp. Codes R. & Regs. tit. 18, § 428.6.

31.     The assessment and family service plan must include "a statement of the specific immediate problems" and "an assessment of trends in the stability of the family unit, and of the likelihood that specific preventive services will increase family stabilization sufficiently to prevent placement or to reduce the duration of a necessary placement" so that the services provided can be appropriately tailored to the family's needs and address the perceived risks to the child.  Reassessments must be undertaken if revisions are required to ensure the efficacy of a plan.  N.Y. Soc. Serv. Law § 409-e.

32.     ACS is responsible for "[p]roviding, arranging for, and/or coordinating services."  N.Y. Comp. Codes R. & Regs. tit. 18, § 432.2 (b)(4).  These services must be "likely to reduce the risk related to one or more identified risk elements" relevant to the safety of the subject child.  *Id*.

33.    ACS has a continuing responsibility "to ensure . . . services are being implemented in the established plan for services, and that the service plan is modified when progress has been insufficient." N.Y. Comp. Codes R. & Regs. tit. 18, § 432.2 (b)(5)(ii).

## FACTUAL ALLEGATIONS

34.    ACS, with more than 17 offices across New York City, is the City agency responsible for responding to reports of child abuse and neglect; providing and administering programs to strengthen families; making reasonable efforts to encourage and assist families to use available resources to reduce the risk of children's placement into substitute care; providing substitute care only when child safety concerns and risk factors cannot be reasonably reduced or eliminated through the provision of services; and making appropriate services available after separation to hasten reunification. N.Y. City Charter § 617.

35.    For parents with actual or perceived intellectual disabilities who are being investigated by ACS or are involved in abuse or neglect proceedings, ACS must first evaluate the needs of the parent as they relate to the perceived risks to the child; identify the appropriate and particularized services required to address those needs; provide the specific services tailored to the parents' needs; and monitor the progress of the service plan, making adjustments as necessary.

36.    ACS consistently treats parents with actual or perceived intellectual disabilities differently from parents without intellectual disabilities. It fails to make reasonable accommodations to meet their needs, discriminates against them in the provision of services, and penalizes them for acts for which they would not penalize parents without intellectual disabilities.

**ACS Routinely Fails to Identify the Needs of Parents with Intellectual Disabilities and Routinely Fails to Refer Them to Appropriately Tailored Services**

37.     At various points in an ACS investigation and case, ACS is required to assess the risk presented to a child and to provide tailored services that will enable parents to alleviate identified risks so that the family can remain intact or, if a removal has already taken place, so that reunification occurs as quickly as possible.

38.     ACS routinely fails to adequately identify and assess the nature or extent of a parent's actual or perceived intellectual disability and the parent's need for services.

39.     ACS fails to ensure that all of its direct staff and all staff at the agencies with which it contracts are adequately trained in working with parents with intellectual disabilities.  As a result of its failure to train its workers and properly assess parents, ACS does not provide appropriately tailored services to parents with intellectual disabilities.  Such parents are at a disadvantage in working to alleviate or address the risks that ACS has identified.

40.     For example, ACS routinely refers parents with actual or perceived intellectual disabilities to mental health services instead of parenting skills classes, even when there is no history of or allegation of mental illness.

41.     Even when ACS refers parents with intellectual disabilities to classes such as parenting skills classes, these classes are rarely, if ever, tailored to individuals with intellectual disabilities.  Because these services are not tailored to address the specific needs of parents with intellectual disabilities, these parents have a greater likelihood of failing to successfully complete such classes.

42.     In the limited circumstances when ACS makes appropriate referrals, it fails to incorporate accommodations, such as reminders or calendars, which may be necessary in order for parents with intellectual disabilities to successfully engage in and complete such services.

43.     ACS also sometimes refers parents with actual or perceived intellectual disabilities to the Office for Persons with Developmental Disabilities ("OPWDD"), a state agency tasked with coordinating services for New York residents with developmental disabilities, including intellectual disabilities.  However, a referral to OPWDD alone is not an adequate referral.

44.     The OPWDD process is long and arduous, and most parents with intellectual disabilities cannot navigate the process without the assistance of their ACS or foster care worker.  Many ACS and foster care workers are not adequately trained to assist in the OPWDD application process, and regardless, do not offer assistance in this regard.

45.     Many parents with actual or perceived intellectual disabilities also do not qualify for OPWDD services because OPWDD has stringent requirements for the onset date of the diagnosed disability.

46.     OPWDD does not offer services focused on parenting support. Instead, OPWDD offers a variety of services, such as help with budgeting and transportation, which may, or may not, indirectly assist with parenting.

47.     ACS rarely refers parents with actual intellectual disabilities to providers that offer tailored services to parents with intellectual disabilities.

48.     There are not enough appropriate providers in New York City to address the needs of parents with intellectual disabilities, so parents are unable to address deficits identified by ACS.

49.     This dearth of providers leads to unnecessary removals and delays in reunifications of families.

**Parents with Actual or Perceived Intellectual Disabilities are Treated Differently From Others at All Stages of an Investigation and Throughout an Abuse or Neglect Proceeding**

Investigations

50.     When ACS child protective specialists are initially assigned to investigate allegations of child abuse or neglect made against a parent, ACS can 1) deem the allegations unfounded; 2) refer the family for preventive services without court intervention; or 3) file an Article 10 petition in family court, charging the parent with abuse or neglect ("Article 10 case").

51.     Because ACS fails to appropriately identify and assess the needs of parents with actual or perceived intellectual disabilities, and therefore fails to focus on the relationship between these needs and the perceived risks to the children, ACS is less likely to find allegations to be unfounded, is less likely to refer families for preventive services without court intervention, and is more likely to file Article 10 cases in family court.

Emergency Removals and Related Court Proceedings

52.     ACS may also make emergency removals of children prior to a hearing if it believes a child is at imminent risk of harm and there is no opportunity to first seek a court order.

53.     When parents have actual or perceived intellectual disabilities, ACS disproportionately makes emergency removals when there is no evidence of imminent risk of harm because of ACS caseworkers' preconceived notions about the risk that parents with actual or perceived intellectual disabilities pose to their children.

54.     Further, ACS fails to appropriately identify and assess the needs of parents with actual or perceived intellectual disabilities and the relationship between these needs and the risks to their children at the emergency removal stage.

55.     This failure harms parents with actual or perceived intellectual disabilities because ACS cannot then refer those parents to appropriate services.

56.     When courts determine whether an emergency removal was appropriate, they must evaluate whether there is actually an imminent risk to the child and whether services could be put in place that would alleviate this risk, thereby obviating the need for removal.

57.     Because ACS fails to identify and assess the needs of parents with actual or perceived intellectual disabilities, and therefore fails to recommend services that could alleviate the perceived imminent risk to the child, courts are more likely to sanction the emergency removals, keeping children in the custody of ACS longer than is necessary or appropriate.

Upon Filing an Article 10 Case

58.     When ACS files an Article 10 case in family court, ACS can ask the court to 1) release the child to the parent with court ordered supervision, with services or without any services, or 2) remove the child from the parents' care.

59.    ACS routinely seeks removal of children from the care of parents with actual or perceived intellectual disabilities because of its failure to appropriately identify and assess the needs of those parents and the relationship between these needs and the perceived risks to their children.  In contrast, ACS routinely releases children to parents without intellectual disabilities, with supervision and services, at this stage of the Article 10 process.

Working Toward Reunification

60.    If a child is removed by ACS, ACS is further charged with working with parents to develop a permanency plan for the child and a service plan for the family.

61.    Family reunification, except in unusual and extreme circumstances, is the initial permanency plan for most children.

62.    ACS is required to provide services and service referrals that will enable the parent to overcome the deficiencies that ACS has identified as creating a risk to the child.

63.    If ACS seeks to change the plan to another permanent living arrangement, such as adoption, ACS must show that it has made reasonable efforts to enable the parent to reunite with the child.

64.    Because ACS fails to appropriately identify and assess the needs of parents with actual or perceived intellectual disabilities and the relationship between these needs and the perceived risks to their children, and fails to provide them with appropriately tailored services, ACS routinely fails to assist these parents in addressing

the risks that it has identified, resulting in children remaining separated from their parents for longer than necessary.

65.    ACS routinely fails to return children to parents with actual or perceived intellectual disabilities even after the parents complete the recommended services.

66.    Because of these failures, ACS routinely seeks to change permanency plans for parents with actual or perceived intellectual disabilities, from reunification to something other than return to parent, without ever having actually provided appropriately tailored services.

<u>Return of the Child</u>

67.    When a child is returned to a parent during the pendency of an abuse or neglect action, ACS routinely refers the family to preventive services to ensure the home remains stable and the child does not return to foster care.

68.    ACS does not currently contract with preventive agencies able to adequately provide services to parents with actual intellectual disabilities, or otherwise provide such services.

69.    Because ACS does not currently provide adequate preventive services or ongoing accommodations to parents with actual intellectual disabilities, ACS is less likely to support the return of the child, and if the child is eventually returned, reunification often fails.

<u>Settlement and Trial in an Article 10 Case</u>

70.    If parents comply with services and their children are in their custody, ACS may offer an administrative dismissal of the abuse or neglect petition, or may withdraw its petition, resulting in no finding of abuse or neglect.

71.    ACS may also offer a settlement, in which a parent agrees to a finding of abuse or neglect without any admission of wrongdoing.

72.    Because ACS fails to appropriately identify and assess the needs of parents with intellectual disabilities and the relationship between these needs and the risks to their children, and fails to provide appropriately tailored services, these parents do not receive the services necessary for them to be able to demonstrate growth in the identified needs areas.  Therefore the parent cannot alleviate ACS's concerns.

73.    ACS routinely fails to offer parents with actual or perceived intellectual disabilities administrative dismissals, and is more likely, if it offers a resolution, to offer a settlement requiring a parent to accept a finding of abuse or neglect.

74.    ACS is also less willing to return children to parents with actual or perceived intellectual disabilities.

75.    Cases involving parents with actual or perceived intellectual disabilities thus more often result in a finding of abuse or neglect, which have far-reaching consequences, including inclusion of the parent's name on the state central registry, which can affect the parent's ability to find employment, work with children, or serve as a foster parent.

76.    If a case is not resolved on a consensual basis, a bench trial is held and a court determines whether ACS has proven the allegations of neglect or abuse.

Disposition

77.    If there is a finding of abuse or neglect in an Article 10 case, at the disposition phase, ACS can request that the court order the children released to their parent(s), placed (or kept) in foster care, or placed (or kept) with another parent, family member, or friend.

78.    Parents with actual or perceived intellectual disabilities are less likely than parents without intellectual disabilities to have their children released to their care because ACS fails to assess the parent's actual or perceived intellectual disability and the services the parent requires; fails to provide appropriate services; refers parents to service providers that cannot timely provide services; and refers parents to service providers that do not provide appropriate tailored services, and therefore such services fail to alleviate ACS's concerns.

Termination of Parental Rights

79.    If children are in the legal custody of ACS for 15 out of 22 months, the foster care agency must file a termination of parental rights petition on behalf of ACS, unless good cause is shown. 42 USCS § 675(5)(E).

80.    Termination of parental rights petitions are disproportionately filed against parents with actual or perceived intellectual disabilities, as compared to others, resulting in a greater risk of permanent loss of custody of the subject children.

81.    Termination of parental rights petitions are disproportionately filed against parents with intellectual disabilities because such disabilities are not recognized or properly assessed; service needs are not met in a timely fashion; and appropriate

16

tailored services are not offered.  As a result, ACS's concerns that lead to placement are not fully addressed.

## NAMED PLAINTIFF FACTS

### Josefina S.

82.    Plaintiff Josefina S. is a parent with an intellectual disability.  She has four children, L.S. (14 years old), X.S. (12), C.S. (6), and L.B.J.S.R. (5), and currently resides in the Bronx.

83.    L.S., X.S., and C.S. have special needs.

84.    On or about June 18, 2012, X.S. fell in school and was sent to the hospital by his school.  The school made a report to the New York Statewide Central Register ("SCR") of Child Abuse and Maltreatment, and ACS began an investigation.

85.    ACS removed all of Josefina S.'s children from her custody and placed them in non-kinship care.

86.    ACS had never previously been involved with the family.

87.    Shortly after the children's removal, ACS filed an Article 10 neglect petition against Josefina S., alleging that X.S. had bumps and bruises; the children had an odor and unclean clothing; and Josefina S. had failed to have X.S. and L.S. psychiatrically evaluated and failed to obtain an MRI for C.S.

88.    After filing the petition, ACS asked Josefina S. to complete a parenting class for children with special needs and a mental health evaluation.  Josefina S. complied with both requests.

89.    When Josefina S.'s youngest child, L.B.J.S.R. was born in August 2012, ACS filed a derivative Article 10 petition five days after his birth and sought his

removal.  L.B.J.S.R. was immediately placed into ACS custody, in the same foster home as his three older siblings.

90.    On May 9, 2013, Josefina S. agreed to allow the Court to enter a finding of neglect, with L.S. being immediately discharged to Josefina S.'s care on a trial basis.

91.    In April 2014, ACS petitioned to terminate Josefina S.'s parental rights to her other three children (L.B.J.S.R., X.S., and C.S.).  The trial began on January 13, 2014 and is continuing.

92.    In June 2014, the foster care agency determined that the trial discharge of L.S. had failed, and removed L.S. from Josefina S.'s care because they alleged that she had not disciplined him "appropriately."

93.    Josefina S. and her lawyers disputed this finding in court and L.S. was subsequently returned to his mother's physical care on September 30, 2014.

94.    During the period L.S. was apart from his mother, he was moved through three to four homes and spent time in several respite homes because he developed severe behavioral problems.

95.    Since her children's removal, Josefina S. has completed several parenting classes, at least one of which was for parents of children with special needs.

96.    ACS never referred Josefina S. to any classes that were tailored to parents with intellectual disabilities.

97.    Josefina S. has also consistently attended individual therapy as requested by ACS.

98.     C.S. and X.S. remain in foster care despite the fact that Josefina S. has completed all of the services that ACS recommended, and L.B.J.S.R. was recently released to the care of Josefina S.'s sister.

99.     ACS has discriminated against Josefina S. by failing to provide her with tailored services designed to enable her to address ACS's concerns and by delaying reunification and progress in her case.  As a result, Josefina S. is now facing possible termination of her parental rights to three of her children.

### Deaja D.

100.     Plaintiff Deaja D. is a parent with an intellectual disability.  Deaja D. has one child, D.B. (7 months), and currently resides in Manhattan.

101.     On February 9, 2017, two days after D.B.'s birth, ACS investigated a report to the SCR by a social worker at The Mount Sinai Hospital in New York City.  The report alleged that Deaja D. had an intellectual disability which impaired her ability to parent D.B. and that she needed assistance.

102.     The report cited to instances where Deaja D. had accidentally covered her child's nose with her breast while breastfeeding, had inadequately fed the child, and had fallen asleep while holding the child at the hospital.  The report also alleged that Diana D., Deaja D.'s mother, was willing to assist Deaja D., although Deaja D. would remain the child's primary caregiver.

103.     That same day, an ACS caseworker visited Deaja D. and D.B. at the hospital.  The caseworker spoke with a nurse and Deaja D. regarding the report's allegations.

104.     Deaja D. responded to the allegations in the report by explaining (a) that she had briefly fallen asleep while holding her child less than twenty-four hours

after an emergency caesarean; (b) that she did not plan to breastfeed D.B. going forward because she found breastfeeding painful; (c) that her mother, Diana D., would assist her in caring for her child; and (d) that Deaja D. had a learning disability.

105.    On February 10, 2017, an ACS supervisor reviewed the investigation progress notes and noted Deaja D's intellectual disability, and an ACS caseworker visited Deaja D. in the hospital.

106.    On February 13, 2017, ACS held a child safety conference.  Deaja D., her mother, and D.B.'s father all attended.  At the conference, ACS cited to Deaja D's "severe developmental delay" as a central safety concern and informed Deaja D. that ACS would be filing an Article 10 petition in court seeking the removal of her child. Deaja D. was not offered any services at the conference, although "development disability services" were listed as part of her service plan.

107.    On February 14, 2017, without first referring Deaja D. to any services tailored to the risks ACS had identified, ACS filed an Article 10 petition against Deaja D. and the father of D.B.  The Article 10 petition alleged that Deaja D. could not care for her child solely because of her intellectual disability, referring to instances contained in the February 2017 report and an instance where Deaja D. once asked a nurse to demonstrate how to change a diaper.

108.    Despite identifying and documenting that Deaja D. had an intellectual disability, at no point prior to the filing of the Article 10 petition did ACS recommend an assessment of Deaja D.'s intellectual or parenting capacity or offer to provide or refer Deaja D. to services to assist her as a parent with an intellectual disability.

109.    On March 8, 2017, following an emergency hearing, the Court ordered D.B. to be placed in foster care.

110.    Solely with the assistance of her attorneys, and without any participation from ACS, Deaja D. learned about and enrolled in a parenting course at Sinergia NY that is designed to meet the needs of parents with intellectual disabilities. The Singeria NY class covered a wide range of topics, and included in-home one on one parenting instruction from a social worker, focused on the care and development of infants.

111.    Since March 2017, Deaja D. has consistently visited her child at ACS and engaged in services at Sinergia NY.  Those services have helped Deaja D. prepare for parenting of D.B.  Yet despite all her efforts, ACS has not agreed to increase Deaja D's visitation, citing only generalized safety concerns, nor has it attempted to help Deaja D. achieve reunification with her child.  D.B. remains in foster care to this day with no plan for reunification.

112.    ACS has discriminated against Deaja D. because of her intellectual disability, including by failing to properly assess her disability and to provide her with tailored services designed to enable her to address ACS's concerns and delaying reunification and progress in her case.

**Cynthia Q.**

113.    Plaintiff Cynthia Q. is a parent with an intellectual disability. Cynthia Q. has six children, G.Q. (10 years old), N.P. (9), A.P. (7), N.P. (5), J.C. (4), and S.Q (3), and currently resides in the Bronx.

114.    On June 11, 2015, a report was made to the SCR by G.Q.'s school, alleging educational neglect, and ACS began an investigation.  During the investigation,

the ACS caseworker became suspicious that Cynthia Q. was intoxicated, and Cynthia Q. disclosed that she had used marijuana in the past.

115.    Cynthia Q. agreed to attend an in-patient mother-child drug and alcohol treatment program with her two youngest children, S.Q. and J.C.  Her other four children were placed in the care of their great-grandmother.

116.    Shortly thereafter, ACS filed an Article 10 petition alleging Cynthia Q. had neglected her children, and the arrangements ACS had mandated were formalized.

117.    At the drug and alcohol treatment program, Cynthia Q. underwent a mental health evaluation, which indicated that Cynthia Q. likely had an intellectual disability and that she should be evaluated to determine if services that address cognitive functioning should be implemented.

118.    None of the services offered to Cynthia Q. were tailored to the needs of parents with intellectual disabilities, and ACS never referred Cynthia Q. to any additional cognitive evaluation.

119.    On February 26, 2016, Cynthia Q's four oldest children were removed from their great-grandmother's care because of an alleged unsafe condition in her home.  The children were initially placed together in a non-kinship foster home.

120.    On March 8, 2016, Cynthia Q. completed the drug and alcohol treatment program, and though S.Q and J.C. were released to her care, her four oldest children remained in foster care.

121.    Cynthia Q. engaged in all of the services that ACS recommended.

122.    In May 2016, Cynthia Q. agreed to the court entering a finding of neglect against her based on a promise that such agreement would hasten reunification with her children.

123.    On August 25, 2016, the court released S.Q. and J.C. to Cynthia Q. and her remaining four children remained in the care of ACS.  On October 27, 2016, ACS reported in Court that Cynthia Q. was compliant with all services.

124.    While in foster care, N.P. was left bedridden and in a full body cast in a hospital after breaking his hip.

125.    While in foster care, G.Q. spent two weeks in a psychiatric hospital as a result of behavioral concerns, suicidal ideations, and depression.  G.Q. reported that her problems were, at least in part, because she missed her mother and wanted to return to her care.

126.    On November 14, 2016, Cynthia Q.'s four oldest children were discharged to her care on a trial basis, though one of her children, N.P., was to remain in foster care until his hip injury healed.

127.    Approximately a month later, N.P.'s foster parent informed the agency she could no longer care for him.  Without notifying the court or counsel, and without holding any conferences to plan for the return of N.P. to his mother's care, ACS discharged N.P., still bedbound, to Cynthia Q.

128.    As a result of needing to stay at home to care for N.P., Cynthia Q. was no longer able to attend her outpatient drug treatment, take regular drug tests, or attend mental health services.  She notified her service provider that she would be unable to attend until her son's health improved.

23

129.    Despite Cynthia's explanation to her service provider, in February 2017, ACS determined that the trial discharge had failed because Cynthia Q. was no longer in compliance with her drug treatment and mental health services, and alleged that Cynthia Q. had inadequate food and sleeping arrangements in the home.

130.    As a result, Cynthia Q.'s four older children were immediately removed and returned to non-kinship foster care.  Cynthia Q.'s alleged non-compliance with services derived entirely from her need to care for her injured son, and the necessity of remaining home with him was confirmed by the foster care agency and the child's doctor.

131.    On February 27, 2017, ACS indicated to the Court that they felt Cynthia Q.'s cognitive delays affected her judgment and her ability to parent.  Upon the request of Cynthia Q.'s family court attorney, the court ordered ACS to assist Cynthia Q. in applying for services at Synergia and OPWDD.

132.    ACS has repeatedly indicated in court and during out-of-court conferences that it believes Cynthia Q. has an intellectual disability that impairs her ability to parent and prevents reunification because it affects her parental judgment capacity.

133.    Despite these stated concerns, ACS has never evaluated Cynthia Q.'s actual needs or provided services tailored to parents with intellectual disabilities.

134.    To date, ACS has not assisted Cynthia Q. in applying for OPWDD services.

135.    Four of Cynthia Q.'s six children still remain in foster care.

136.    ACS has discriminated against Cynthia Q. because of her intellectual disability, including by failing to properly assess her disability and to provide her with tailored services designed to enable her to address ACS's concerns and delaying reunification and progress in her case.

**Shantell S.**

137.    Plaintiff Shantell S. is a parent with an intellectual disability. Shantell S. has three children, J.S.R. (3 years old), E.S. (2), and Z.E. (11 months old) and currently resides in Brooklyn.

138.    When E.S. was one year old, ACS investigated a report that was made to the SCR about Shantell S.'s care for her child, E.S.

139.    ACS referred Shantell S. to preventive services with Catholic Charities, but none of the services were tailored to her needs as a parent with an intellectual disability.

140.    In May 2016, Shantell S.'s preventive worker at Catholic Charities called in a new report to the SCR, which specifically identified Shantell S. as having "mental delays."

141.    ACS determined that that the allegations of abuse or neglect were unfounded and closed the case on July 5, 2016.

142.    At no point during this investigation did ACS refer Shantell S. to services tailored to her intellectual disability.

143.    On July 14, 2016, ACS initiated a new investigation into Shantell S., alleging, among other things, that she suffered from "developmental delays" that "impair[ed] her ability to provide care for [E.S.]."

144.    On July 21, 2016, without offering or referring Shantell S. to any services tailored to the intellectual disabilities that ACS had identified, ACS filed an Article 10 petition against Shantell S., and removed E.S. from Shantell S's care.

145.    The Article 10 petition alleged that Shantell S. neglected her child because she was unable to obtain shelter for herself and her child.

146.    At no time prior to the filing of the Article 10 petition did ACS offer or refer Shantell S. to tailored services to assist her with completing the forms necessary to obtain appropriate family housing.  The only referral ACS had given Shantell S. was for a drug treatment program, which was wholly unrelated to the allegations contained in the Article 10 petition.

147.    In October 2016, Shantell S. gave birth to her third child, Z.E. Within days of the child's birth, ACS filed an Article 10 petition alleging derivative neglect of Z.E. and Shantell S.'s oldest child, J.S.R., who permanently resides in a hospital due to hydrocephaly.

148.    At no time between the filing of the first Article 10 petition in July 2016 and the second in November 2016 did ACS provide or refer Shantell S. to any services tailored to the parenting risks that it had identified, which were specifically linked to her identify as a parent with intellectual disabilities.

149.    At a hearing in November 2016, the Court granted Shantell S.'s request that her children be returned to her care.  The Court also ordered ACS to assist Shantell S. in obtaining a family shelter placement.

150.    Through the efforts of her advocates at Brooklyn Defender Services, Shantell S. is now receiving tailored parenting courses at Sinergia and she is also receiving services through OPWDD.

151.    ACS has never referred Shantell S. to services tailored to her disability.

152.    On August 8, 2017, Shantell S. consented to an adjournment in contemplation of dismissal which is due to expire on November 14, 2017, meaning that unless ACS returns to court, alleging a violation of the ACD order, the Article 10 case will be dismissed on that date.

153.    ACS has discriminated against Shantell S. because of her intellectual disability, including by failing to provide her with tailored services designed to enable her to address ACS's concerns and instead pursuing Article 10 petitions against Shantell S. and by delaying reunification and progress in her case.

**Bianca M.**

154.    Plaintiff Bianca M. is a parent with an intellectual disability. Bianca M. has one child, D.W. (3 years old), and currently resides in Manhattan, New York.

155.    In August 2014, ACS investigated a report that the purported father of Bianca M.'s child was committing acts of domestic violence against Bianca M. on a regular basis, in the presence of the child.

156.    The ACS caseworker who investigated the report noted that Bianca M. was cognitively delayed.  The ACS caseworker requested a mental health and domestic violence expert consult for the case, but did not request any consult geared toward Bianca M.'s intellectual disability.

157.    On September 5, 2014, ACS held a child safety conference. Despite noting Bianca M.'s cognitive limitations as a concern, ACS did not suggest that any tailored services be included in the service plan.

158.    On the same day, ACS filed an Article 10 petition against Bianca M. and the purported father of the child, alleging, among other things, that the father perpetuated acts of domestic violence against Bianca M. in the presence of the child and that Bianca M. had a learning disability.  The Court granted removal of the child the same day.

159.    Even though ACS identified Bianca M. as someone with an intellectual disability, the caseworker did not refer Bianca M. to any services that were tailored to her needs as a parent with such a disability.

160.    By February 2015, Bianca M. completed her entire ACS mandated service plan.

161.    At a conference in February 2015, ACS confirmed that Bianca M. had completed all her services and was engaged in weekly therapy.  ACS did not recommend any additional services, including any specifically tailored to the needs of parents with intellectual disabilities.

162.    In April 2015, fact-finding began in the Article 10 case and in September 2015, the Court made a finding of neglect against Bianca M.  The Court ordered Bianca M. to complete comprehensive psychosocial and cognitive testing, and to comply with all recommendations derived from the results.  Bianca M. underwent a series of tests, but none of them evaluated her parenting capacity.

163. In January 2017, during an overnight visit, Bianca M. brought D.W. to the hospital because of a painful diaper rash, and New York Presbyterian Hospital called in a new report to the SCR. After this incident, ACS sought an order from the Court to suspend all unsupervised visits, which was granted.

164. On April 19, 2017, at a conference held by ACS, despite the fact that Bianca M. had diligently completed her entire ACS mandated service plan, ACS changed the permanency goal for D.W. from reunification to reunification with the concurrent goal of adoption.

165. On July 21, 2017, ACS filed a petition to terminate Bianca M.'s parental rights to D.W. The petition is pending.

166. To date, ACS has not referred Bianca M. to any services tailored to her intellectual disability, and therefore has not been able to address the parenting risks that ACS has identified.

167. ACS has discriminated against Bianca M. because of her intellectual disability, including by failing to properly assess her disability and to provide her with tailored services designed to enable her to address ACS's concerns.

## CLASS ACTION ALLEGATIONS

168. Named Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of a class consisting of all parents in the City of New York who have or are perceived to have intellectual disabilities and who are or will be investigated for allegations of child abuse or neglect by ACS ("Plaintiffs" or "Class").

169. The Class is sufficiently numerous to make joinder impracticable.

170.    Brooklyn Defender Services, Neighborhood Defender Service of Harlem, the Center for Family Representation, and the Bronx Defenders all represent parents in abuse and neglect cases in Brooklyn, Manhattan, Queens, and the Bronx. Together, they currently represent approximately 180 parents with intellectual disabilities who have been discriminated against by ACS.

171.    Many other parents, including all ACS involved parents in Staten Island, are represented by individual assigned counsel, who are not affiliated with these offices, so the number of class members is significantly higher than 180.

172.    While the exact number of Class members is unknown to named Plaintiffs at this time and can only be ascertained through appropriate discovery, the proposed Class exceeds several hundred members.

173.    Common questions of fact and law exist as to all members of the Class, including, but not limited to:

(a)    whether Defendant fails to ensure that parents with intellectual disabilities are afforded the opportunity to take full advantage of, and be properly served by, ACS and its contracted agencies;

(b)    whether Defendant discriminates against parents with perceived intellectual disabilities by assuming they are incapable of safely parenting their children;

(c)    whether Defendant fails to reasonably modify existing policies, practices, and procedures to avoid discriminating against parents with actual or perceived intellectual disabilities;

(d)     whether Defendant fails to provide services and assessments tailored to the needs of parents with intellectual disabilities, fails to create and implement an adequate accommodation policy for parents with intellectual disabilities, and fails to provide proper training to its employees in working with parents with intellectual disabilities;

(e)     whether, as a result, parents with actual or perceived intellectual disabilities are routinely being deprived of the opportunity to parent their children through the unnecessary removal of their children, delayed reunification with their children, enhanced advocacy by ACS for findings of abuse or neglect, and disproportionate filings for the termination of parental rights without adequate evidence of abuse or neglect; and

(f)     whether Defendant violates Title II of the ADA and Section 504 of the Rehabilitation Act by its acts and omissions as alleged herein.

174.    The named Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law that is complained of herein.

175.    Named Plaintiffs will fairly and adequately protect the interests of all members of the Class that they seek to represent.  Defendant has acted or failed to act on grounds generally applicable to all members of the Class, necessitating class-wide declaratory and injunctive relief.  Counsel for Plaintiffs know of no conflict among the Class members.

176.    Named Plaintiffs and Plaintiffs are represented by the New York Legal Assistance Group and Davis Polk & Wardwell LLP, counsel who are together

competent and experienced in class action litigation, child welfare litigation, and complex civil litigation.

177.    Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class through trial and any appeals.

## CLAIMS FOR RELIEF

**First Cause of Action**
**(For Violation of the Americans With Disabilities Act, 42 U.S.C. § 12131 *et seq*.)**

178.    Each of the foregoing allegations is incorporated as if fully set forth herein.

179.    Defendant's widespread and systemic discrimination against parents with actual or perceived intellectual disabilities violates Plaintiffs' rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and the regulations promulgated thereunder.

180.    Defendant's widespread and systemic failure to offer services tailored to the needs of parents with intellectual disabilities violates Plaintiffs' rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and the regulations promulgated thereunder.

181.    Defendant's widespread and systemic failure to accommodate parents with intellectual disabilities violates Plaintiffs' rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and the regulations promulgated thereunder.

**Second Cause of Action**
**(For Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794)**

182.    Each of the foregoing allegations is incorporated as if fully set forth herein.

183.    Defendant's widespread and systemic discrimination against parents with actual or perceived intellectual disabilities violates Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.

184.    Defendant's widespread and systemic failure to offer services tailored to the needs of parents with intellectual disabilities violates Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.

185.    Defendant's widespread and systemic failure to accommodate parents with intellectual disabilities violates Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a)    Certify that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, with the plaintiff class consisting of:

(i)    All parents in the City of New York who have or are perceived to have intellectual disabilities, who are or will be investigated for child abuse or neglect by ACS.

(b)      Issue a declaratory judgment that Defendant's practices described below violate the ADA and Section 504 of the Rehabilitation Act:

(i)      Defendant's failure to recognize, acknowledge, or address parents' intellectual disabilities, assess their particularized needs, and provide appropriate and tailored services, support, and service referrals to address the perceived risks to children;

(ii)      Defendant's failure to institute policies, practices, and procedures designed to avoid discriminating against parents on the basis of their intellectual disabilities or to reasonably modify existing policies, practices, and procedures to avoid discriminating against parents on the basis of their intellectual disabilities;

(iii)      Defendant's failure to ensure caseworkers, officials, agents, and other employees follow appropriate policies, practices, and procedures when working with parents with intellectual disabilities, and to provide them with the necessary training to perform their duties without discriminating on the basis of parents' intellectual disabilities; and

(iv)      Defendant's practice of utilizing criteria and methods of administration that have the effect of discriminating against parents on the basis of their actual or perceived intellectual disabilities and defeating or substantially impairing the ability of such parents to parent their children during the course of an ongoing ACS investigation or case.

34

(c)     Grant permanent injunctive relief to remedy Defendant's violations of the ADA and the Rehabilitation Act, including requiring Defendant to:

(i)     Use adequate methods of assessing parents to determine whether or not they have intellectual disabilities that affect their parenting;

(ii)     Recognize and acknowledge parents' intellectual disabilities and determine the appropriate services to address any perceived risks related to the such disabilities;

(iii)     Provide the appropriate services tailored to the needs of parents with intellectual disabilities;

(iv)     Create and implement an adequate reasonable accommodations policy for parents with actual disabilities;

(v)     Ensure caseworkers, officials, agents, and other employees follow the appropriate policies, practices, and procedures when working with parents with actual or perceived intellectual disabilities;

(vi)     Train all ACS workers, including foster care workers, in working with parents with actual or perceived intellectual disabilities; and

(vii)     Provide class members with clear and easily accessible information regarding ACS's reasonable accommodation policy, including, but not limited to, signs posted in prominent locations at every ACS, family court legal services, and foster care agency office.

(d)     Award to Plaintiffs the reasonable costs and expenses

incurred in the prosecutions of this action, including reasonable attorneys' fees, as

provided by 29 U.S.C. § 794a(b) and 42 U.S.C. § 12205; and

(e)     Grant such other and further equitable relief as the Court

deems just and proper.

Dated:  October 6, 2017
New York, New York

BETH GOLDMAN
NEW YORK LEGAL ASSISTANCE
GROUP

/s/ Jane Greengold Stevens

Jane Greengold Stevens, Esq.
Thalia Julme, Esq.
Elizabeth Jois, Esq.
7 Hanover Square
New York, New York 10004
(212) 613-5000
jstevens@nylag.org
tjulme@nylag.org
ejois@nylag.org


DAVIS POLK & WARDWELL LLP

/s/ James H.R. Windels

James H.R. Windels, Esq.
Sharon Katz, Esq.
Dara L. Sheinfeld, Esq.
Cindy S. McNair, Esq.
Alexa B. Lutchen, Esq.
Iris Hsiao, Esq.
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
james.windels@davispolk.com
sharon.katz@davispolk.com