# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEFINA S., DEAJA D., CYNTHIA Q., SHANTELL S., and BIANCA M. on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

THE CITY OF NEW YORK,

Defendant.

Index No. 17-7661 (AJN)

## DECLARATION OF DONALD LASH
## IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Donald Lash hereby declares, pursuant to 28 U.S.C. § 1746:

1. I submit this declaration in support of Plaintiffs' motion for class certification. I have personal knowledge of the facts contained in this declaration and, if called as a witness, am competent to testify as to those facts, except as to matters expressly stated to be upon opinion and belief, and as to those, I believe them to be true.

2. I am the Executive Director/Chief Executive Officer at Sinergia. I have been in this position since 2014. I previously worked at Sinergia from 1993 to 2005, serving as Staff Attorney, Director of Housing Advocacy and Development, Director of the Metropolitan Parent Center, Deputy Executive Director, and Executive Director. In 2005, I left Sinergia and worked for the New York City Administration for Children's Services ("ACS"), serving as Agency Attorney until leaving ACS' employ to return to Sinergia in 2014.

## I. Sinergia's full range of services

3. Sinergia is a not-for-profit organization with its principle place of business at 2082 Lexington Avenue, New York, NY 10035.

4. Sinergia has been working with individuals with intellectual and developmental disabilities in New York City since 1977.

5. Sinergia offers a variety of services and supports to adults, children, and youth with intellectual and developmental disabilities and their families, including, but not limited to, certified and uncertified housing with support services, sponsorship of Family Care homes, a variety of day and employment service programs, Medicaid and non-Medicaid service coordination, in-home and site-based respite programs, Community Habilitation, housing and educational advocacy, parent training, recreation, and Family Reimbursement grants.

## II. Services offered through "We Are Parents Too"

6. Since about 1990, Sinergia has been offering a parenting course, currently entitled "We Are Parents Too," which is designed to teach and develop parenting skills to our program participants, who consist of parents with intellectual and developmental disabilities.

7. We Are Parents Too is a ten week parenting class typically offered four times a year to a small group of parents, no more than ten parents per class. Any larger group size would make it difficult to provide the reinforcement and repetition, along with individualized attention, necessary to meet the learning needs of people with intellectual disability. Many of our participants come to us because they are seeking reunification with their children who have been taken into foster care.

8. Only one employee, who has other duties at Sinergia, is assigned to this project due to funding restrictions. Based on this limitation, we can currently serve no more than 40 parents per year.

9. The We Are Parents Too course consists of ten consecutive classes focused on building empathy and parent-child relationships, child development, positive discipline, safety, nutrition, health and self-care, and self-advocacy. The classes are tailored to meet the needs of diverse learners. This means that the materials are presented at a slow pace, visual aids are frequently used, information is repeated as often as is needed for the group, and check-ins frequently occur to reinforce ideas and to help these parents connect with the material.

10. The We Are Parents Too course is specifically designed to meet the needs of parents with intellectual disabilities and to provide them with parenting instruction. The training methods are those which have demonstrated success with individuals with intellectual disabilities. These include repetition and reinforcement, visual cues, minimal use of text, hands-on practice, dialogue, and group discussion.

11. In addition to the parenting instruction, the design for We Are Parents Too includes assessment of strengths, challenges and goals, one on one support in individual sessions with the director of the program, and identification of and linkage with additional supports (e.g., Community Habilitation, respite, housing) for which the parent might be eligible. Sometimes this includes visit coaching as well as communication with involved individuals from ACS, foster care agencies, and other agencies involved in these parents' lives.

12. There is also a peer support group at which parents who have completed the course are welcome, and many attend consistently or intermittently.

13. Measures of success include participant satisfaction surveys and self-assessments, progress toward goals, feedback from involved stakeholders, and internal quality assurance review. Use of more formal pre- and post-assessment measures is a goal of We Are Parents Too, but this goal has been deferred due to financial constraints. Anecdotal evidence of effectiveness, however, has come in the last two years from parents being reunited with their children for final or trial discharge and parents reporting greater success in managing visits and meeting the expectations of the court and/or foster care agencies.

14. We Are Parents Too is the only parenting program in New York City offered to parents with children in foster care that is tailored to meet the needs of parents with intellectual disabilities.

### III. Funding history

15. We Are Parents Too was initially funded as a pilot program by the NYS Developmental Disabilities Planning Council ("DDPC").

16. Once the pilot funding from DDPC was exhausted, the New York State Office for Mental Retardation and Developmental Disabilities, now known as the NYS Office for People with Developmental Disabilities ("OPWDD"), agreed to indefinite funding through a funding stream called Individual Support Service ("ISS").

17. After a number of years, ISS was restructured and OPWDD's use of ISS contracts was reduced in scope. We Are Parents Too was continued with funding through the Family Support Services funding stream, with state (non-Medicaid) dollars from OPWDD.

18. In 2014, Sinergia was notified that Family Support Services funding would be terminated for We Are Parents Too, but that parents who were eligible for Community Habilitation services through OPWDD could continue to be served. While Sinergia has

endeavored to enroll parents in Community Habilitation, this program is part of New York State's Home and Community Based Services Medicaid Waiver ("HCBS Waiver"), and there are considerable bureaucratic barriers to establishing eligibility and obtaining approval for Community Habilitation services and hours. As a result, it is typically difficult to obtain authorization to bill for services before the services are needed.

19. Although the bulk of our referrals are for parents with abuse or neglect cases, we do not receive funding from ACS.

20. Approximately one-third of referrals between September 2017 and May 2018 have come directly from our clients' attorneys at the four institutional providers: Brooklyn Defender Services, Bronx Defenders, Neighborhood Defense Service of Harlem, and the Center for Family Representation.

21. If the client is already enrolled in OPWDD services, we can bill OPWDD for the services. However, most clients we see have not been deemed OPWDD eligible.

22. OPWDD is a system with significant barriers to entry. Our clients must present proof of disability (and onset before age 22) to establish eligibility for OPWDD services. This can be difficult if records need to be accessed or new evaluations need to be prepared.

23. In addition to OPWDD eligibility, our clients must go through another burdensome process in order to establish eligibility for HCBS Waiver services, such as Community Habilitation program. Paperwork must be completed and processed and approvals secured, and a Care Coordinator must be selected and assigned to serve as a gatekeeper.

24. Often a parent with intellectual disabilities will be in the process of applying for OPWDD when they are first referred to us. We cannot bill OPWDD for services provided prior to OPWDD enrollment because the coverage is not retroactive. Nonetheless, we generally enroll

parents in our class as soon as we are able to and do not wait for the OPWDD enrollment to be complete because it is in the best interest of our program participants to receive classes as soon as possible. When this occurs we do not receive payment for the services we provide.

25. Where the family courts have specifically ordered ACS to refer a parent to our class, we invoice ACS or the foster care agency; however, the invoices are sometimes ignored. This appears to be a reflection of the fact that when these services are ordered by the courts, there is no established funding stream for provision of the services, so agencies don't appear to have a procedure or mechanism for processing the invoices.

### IV. Sinergia's current capacity is extremely limited

26. Currently, our capacity to serve parents with intellectual disabilities is extremely limited due to our lack of funding.

27. Generally, we try to offer the We Are Parents Too course once every quarter. However, this year, we were not able to offer the course in the summer of 2018.

28. We currently have a waitlist of 11 parents for whom service is requested. The pace of referrals has been steady, despite the fact that Sinergia has not had the resources to conduct outreach or the capacity to handle a greater number of referrals that could be expected to follow outreach. Though this waitlist is relatively small, the number of parents who need our services, but have not been referred, is much larger.

### V. Interaction with the Courts

29. The family courts do not appear to know Sinergia's limitations or its relationship with ACS.

30. Court orders tend to follow from requests from the institutional defenders. In May of 2017, Sinergia had seven court orders pending. Unfortunately, family court judges are

not generally aware that Sinergia is not an ACS "contract agency," and, therefore, assume that with a court order, payment for services will be automatic. As noted above, however, the absence of an established funding mechanism means that invoices for services are often not paid because the agency requesting services does not know how to process them. Sinergia has expended a great deal of effort and personnel hours trying to resolve the difficulties obtaining payment for court-ordered services to no avail.

## VI.     Observations about ACS

31.     Sinergia has had frequent, significant interactions with case planners and other workers within the child welfare system in connection with services provided to parents with intellectual disabilities. Based on these interactions, Sinergia concludes that there is a need for professional development around intellectual and developmental disabilities to address gaps in knowledge and mistaken beliefs. Often, workers are not sure what an intellectual or developmental disability is and how to differentiate it from other disabilities or mental health concerns. Even more frequently, these workers do not know what supports and services the parent might be eligible for and how these supports and services might stabilize the parent and strengthen his or her ability to parent successfully. Additionally, some of these workers appear to adhere to an outmoded belief that services for people with intellectual disabilities are standardized and segregated, reminiscent of the era of institutionalization, and are, therefore, not conducive to parenting at home and in the community.

## VII.    Services Sinergia would offer if they were fully funded.

32.     Sinergia is capable of scaling up and enhancing its services in the event that We Are Parents Too secures stable, reliable funding.

33. As noted above, more complete pre- and post-services assessments of the parent's ability would help to measure Sinergia's impact and refine the program. Adequate resources for one on one support and follow-up, including after completion of the ten-week cycle of classes, would help to maximize and preserve the benefits of the group process. The peer support group, which is currently completely unfunded, could, with minimal support, become a chosen long-term natural support for parents.

34. While Sinergia's curriculum is evidence-informed and reflects its experience and research, an adequately resourced program could and should partner with institutions of higher education to continuously improve the quality of the program and its responsiveness to the needs of a historically under-served and ill-served population.

Dated: New York, New York

September 6, 2018

_____
Donald Lash